[Cite as *State v. Sharpe*, 2025-Ohio-440.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HOCKING COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | Case No. 23CA3 |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | |
| v. | : | |
| | : | DECISION AND |
| WILLIAM SHARPE, | : | JUDGMENT ENTRY |
| | : | |
| Defendant-Appellant. | : | |
| | : | |

_____
APPEARANCES:

Benjamin E. Fickel, Logan, Ohio, for Appellant.

Jennifer M. Graham, Hocking County Prosecuting Attorney, Alisa Turner, Hocking County Assistant Prosecuting Attorney, Logan, Ohio, for Appellee.
_____

Smith, P.J.

{¶1} Appellant William M. Sharpe "Sharpe," appeals from the March 3, 2023 Judgment Entry of Sentence of the Hocking County Common Pleas Court. Sharpe was convicted at a jury trial of seven counts which included rape, sexual battery, gross sexual imposition, and attempted rape. In addition, he was convicted of one count of unlawful sexual conduct, tried to the bench. Three alleged victims, L.R., A.G., and B.B., testified against Sharpe. On appeal, Sharpe raises three assignments of error asserting that: (1) the trial court committed plain error when

it failed to order separate trials concerning the allegations of the three victim witnesses; (2) the trial court abused its discretion by allowing count six to be amended; and (3) count six is not supported by sufficient evidence. Based upon our review, however, we find no merit to the assignments of error. Accordingly, Sharpe's assignments of error are hereby overruled and the judgment of the trial court is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

{¶2} In August 2022, Sharpe was indicted on 14 various sex offenses involving L.R., A.G., and B.B. Sharpe filed a motion to sever, which was denied on November 18, 2022. On January 12, 2023, the State filed a motion to amend indictment, noting that several of the counts had been dismissed, renumbering the counts, and requesting amendment to count five. Sharpe did not object and the amendment was granted. However, the morning of trial, the State moved to amend new count six. The parties argued the issue and the trial court ultimately granted the amendment.

{¶3} When Sharpe proceeded to trial on January 17, 2023, the State presented evidence pertaining to the following nine sex offenses:

> Count One: Rape, R.C. 2907.02(A)(1)(b), 2907.02(B), a felony of the first degree;
>
> Count Two: Sexual Battery, R.C. 2907.03(A)(5), 2907.03(B), a felony of the second degree;

Count Three: Gross Sexual Imposition, R.C.
2907.05(A)(4), 2907.05(C)(2), a felony of
the third degree;

Count Four:  Rape, R.C. 2907.02(A)(2), 2907.02(B), a
felony of the first degree;

Count Five:  Attempted Rape, R.C.
2923.02/2907.02(A)(2), 2907.02(B), a
felony of the second degree;

Count Six:   Gross Sexual Imposition, R.C.
2907.05(A)(1), 2907.05(C)(2), a felony of
the third degree;

Count Seven: Gross Sexual Imposition, R.C.
2907.05(A)(4), 2907.05(C)(2), a felony of
the third degree;

Count Eight:  Rape, R.C. 2907.02(A)(2), 2907.02(B), a
felony of the first degree; and,

Count Nine:  Unlawful Sexual Conduct with a Minor,
R.C. 2907.04(A), 2907.04(B)(4), a felony
of the second
degree.

{¶4} The State presented testimony from the three alleged victims and

several lay witnesses, including Kevin Culbertson, the owner of Kevin's Marathon,

a gas station/convenience store/garage, and Detective Vincent Scalmato. The

testimony of the alleged victims will be set forth below where relevant. Sharpe did

not testify but he presented testimony from his current wife and a former long-term

girlfriend. At the conclusion of trial, the jury found Sharpe guilty of counts one

through seven and returned a not guilty verdict on count eight. The trial court found Sharpe guilty on count nine.

{¶5} At Sharpe's sentencing on February 23, 2023, after merging two of the counts, the trial court imposed a consecutive term of imprisonment of 28 years to life. This timely appeal followed.

ASSIGNMENTS OF ERROR

I.    THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO ORDER SEPARATE TRIALS FOR THE SEPARATE VICTIMS.

II.   THE TRIAL [SIC] ABUSED ITS DISCRETION BY ALLOWING THE AMENDMENT OF COUNT SIX OF THE INDICTMENT FROM R.C. 2907.05(A)(4) TO R.C. 2907.05(A)(1).

III.  APPELLANT'S CONVICTION FOR GROSS SEXUAL IMPOSITION R.C. 2907.05(A)(1) (COUNT SIX OF THE INDICTMENT) IS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶6} Sharpe points out that the indictment contained similar allegations related to the three separate victims. L.R., A.G., and B.B. all testified at trial regarding separate acts that took place during different time frames. Under the first assignment of error, Sharpe asserts that in closing, the State tied the testimony of the three witnesses together. In doing so, Sharpe argues, the State bolstered each of the witnesses' allegations against him with the others' allegations and clearly prejudiced him with the jury.

## STANDARD OF REVIEW-MOTION TO SEVER

{¶7} Ordinarily, appellate courts review trial court decisions regarding a Crim.R. 14 motion to sever criminal charges under the abuse of discretion standard. *State v. Sims*, 2023-Ohio-1179, ¶ 37 (4th Dist.); *State v. Ford,* 2019-Ohio-4539, ¶ 106. An abuse of discretion implies that a court's attitude is unreasonable, arbitrary or unconscionable. " 'A decision is unreasonable if there is no sound reasoning process that would support that decision.' " *Ford* at ¶ 106, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161 (1990). "[A]n 'arbitrary' decision is one made 'without consideration of or regard for facts [or] circumstances.' " *State v. Beasley*, 2018-Ohio-16, ¶ 12, quoting Black's Law Dictionary 125 (10th Ed. 2014), and citing *Dayton ex rel. Scandrick v. McGee,* 67 Ohio St.2d 356, 359 (1981), quoting Black's Law Dictionary 96 (5th Ed. 1979) ("arbitrary" means " 'without adequate determining principle; * * * not governed by any fixed rules or standard' "). An unconscionable decision is one "showing no regard for conscience" or "affronting the sense of justice, decency, or reasonableness." Black's Law Dictionary (11th Ed. 2019). An unconscionable decision also may be characterized as "[s]hockingly unjust or unfair." Black's Law Dictionary (11th Ed. 2019). Moreover, when

reviewing for an abuse of discretion, appellate courts must not substitute their judgment for that of the trial court. *E.g., State v. Grate*, 2020-Ohio-5584, ¶ 187; *In re Jane Doe 1,* 57 Ohio St.3d 135, 137-138 (1991).

{¶8} However, the trial transcript does not reflect that Sharpe renewed his motion to sever at the close of the State's case or at the close of all the evidence. Where a defendant files a motion to sever but ultimately fails to renew his motion at the close of either the State's case or presentation of all evidence, the defendant waives all but plain error on appeal. *See State v. Moshos,* 2010-Ohio-735 ¶ 77 (12th Dist); *State v. Sapp,* 2004-Ohio-7008, ¶68. Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error does not exist unless "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 97 (1978). The plain error rule is applied "under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* Sharpe contends that the trial court's denial of his motion to sever constitutes plain error.

LEGAL ANALYSIS

{¶9} Crim.R. 8(A) specifies that "[t]wo or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged * * * are of the same or similar character * * *." *See Sims,*

*supra*, at ¶ 35.  The rule further permits the joinder of offenses that "are based on the same act or transaction or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan or are part of a course of criminal conduct."  *Id*.  As a general rule, the law favors joinder and the avoidance of multiple trials.  *Sims,* ¶ 36.  *E.g., State v. Gordon*, 2018-Ohio-259, ¶ 18.  Joint trials "conserve[ ] judicial and prosecutorial time, lessen[ ] the not inconsiderable expenses of multiple trials, diminish[ ] inconvenience to witnesses, and minimize[ ] the possibility of incongruous results in successive trials before different juries."  *State v. Thomas*, 61 Ohio St.2d 223, 225, (1980); *accord Zafiro v. United States,* 506 U.S. 534, 537 (1993), quoting *Richardson v. Marsh*, 481 U.S. 200, 209 (1987) (joint trials "promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts' ").  If, however, joinder prejudices a defendant, Crim.R. 14 gives a trial court discretion to sever the trials:  "If it appears that a defendant * * * is prejudiced by a joinder of offenses * * *, the court shall order an election or separate trial of counts, * * *, or provide such other relief as justice requires."  *See Sims, supra.*

{¶10} " 'A defendant who appeals the denial of relief bears a heavy burden to establish that a trial court abused its discretion."  *Sims*, ¶ 38, quoting *Ford* at ¶ 106.  To establish that a trial court's refusal to sever a trial constitutes an abuse of

discretion, a defendant must establish that holding combined trials prejudiced the defendant's rights. *Gordon* at ¶ 21. In *Sims*, this Court observed that the test is:

> "whether a joint trial is so manifestly prejudicial that the trial judge is required to exercise his or her discretion in only one way —by severing the trial. * * * A defendant must show clear, manifest or undue prejudice and violation of a substantive right resulting from failure to sever."

*Sims, ¶38* quoting *State v. Schiebel*, 55 Ohio St.3d 71 (1990), quoting *United States v. Castro,* 887 F.2d 988, 996 (9th Cir. 1989). A defendant must provide "the trial court with sufficient information so that it [can] weigh the considerations favoring joinder against the defendant's right to a fair trial." *State v. Torres,* 66 Ohio St.2d 340 (1981), syllabus; *accord Ford* at ¶ 106. Furthermore, "a trial court does not abuse its discretion in refusing to grant severance where the prejudicial aspects of joinder are too general and speculative." *State v. Payne*, 2003-Ohio-4891, ¶ 28 (10th Dist.).

{¶11} If a defendant presents sufficient information to show that joining offenses for trial will prejudice the defendant's rights, the State can overcome the defendant's claim of prejudicial joinder by showing either: (1) the State could have introduced evidence of the joined offenses as other acts under Evid.R. 404(B) (the other-acts test); or (2) the "evidence of each crime joined at trial is simple and direct" (the joinder test). *Sims,* ¶ 39; *E.g., State v. Lott,* 51 Ohio St.3d 160, 163 (1990). " 'The two tests are disjunctive, so that the satisfaction of one negates a

defendant's claim of prejudice without consideration of the other.' " *State v. Wright,* 2017-Ohio-8702, ¶ 51, quoting *State v. Sullivan,* 2011-Ohio-6384, ¶ 23 (10th Dist.). Accordingly, " '[i]f the state can meet the joinder test, it need not meet the stricter 'other acts' test.' " *Sims,* at ¶ 49, quoting *State v. Johnson*, 88 Ohio St.3d 95, 109 (2000).

{¶12} Evidence of joined offenses is simple and direct when (1) the jury is capable of readily separating the proof required for each offense; (2) the evidence is unlikely to confuse the jurors; (3) the evidence is straightforward and easy to understand; (4) the offenses involve different victims, different incidents, and different witnesses; and (5) little danger exists that the jury would improperly consider testimony on one offense as corroborative of the other. *See State v. Freeland,* 2015-Ohio-3410, ¶ 14 (4th Dist.); *accord State v. Pate,* 2021-Ohio-1838, ¶ 57 (2nd Dist.); *State v. Dantzler,* 2015-Ohio-3641, ¶ 23 (10th Dist.); *State v. Clifford*, 135 Ohio App.3d 207, 212 (1st Dist.1999). Furthermore, " 'Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof.' " *State v. Echols,* 2015-Ohio-5138, ¶ 16 (8th Dist.), quoting *State v. Lewis,* 2010-Ohio-4202, ¶ 33 (6th Dist.).

{¶13} We additionally note that the purposes of the joinder test are (1) "to prevent the finder of fact from confusing the offenses," *State v. Varney,* 2008-Ohio-

5283, ¶ 19 (4th Dist.), and (2) "to prevent juries from combining the evidence to convict" the defendant of multiple crimes, "instead of carefully considering the proof offered for each separate offense." *State v. Mills,* 62 Ohio St.3d 357, 362 (1992).

{¶14} Upon review of the trial testimony of L.R., A.G., and B.B., we agree with the State that the evidence of each crime joined at trial is simple and direct. Each alleged victim identified Sharpe in the courtroom.[1] The prosecution presented  evidence that related to each offense in a simple and direct manner, and separately presented the circumstances of each individual's encounters with Sharpe, as is set forth below.

{¶15} L.R. was the named victim in counts one, two, and three.  It was alleged that the criminal acts involving L.R. occurred in 2018.  At the time of trial, L.R. was 16 years old.  L.R.'s mother was married to Sharpe and had two younger daughters with Sharpe.  L.R. testified she first met Sharpe when she was six or seven and Sharpe and her mother began dating.

{¶16} L.R. testified that a couple of years after Sharpe and her mother married, L.R. began feeling uncomfortable around Sharpe.  He made inappropriate comments to her about "developing and getting older."  When L.R. was around 11 or 12 years old, Sharpe once mentioned to her that he and her mother "weren't

---

[1] In the testimony, Sharpe is often referred to as "Mickey."

having enough sex." Then, Sharpe began inappropriately touching her. L.R. testified:

> It was mainly tickling and…it just felt uncomfortable and he got closer to inappropriate places….He used to smack my butt sometimes. He would tickle me in-between my thighs…My boobs.

L.R. testified she told her mother but her mother said that "he probably didn't mean it in a way like that." L.R. testified she was between 9 and 12 years old when these actions occurred.

{¶17} L.R. testified that Sharpe's behavior eventually moved past comments and tickling. She described an incident which occurred when she was 12 years old. She was wearing her pajamas and a Minion T-shirt. L.R. testified:

> So I was in my bedroom. I was playing - - laying on my bed playing a game on my Xbox. And my mom used to work dayshifts so she was either about to go to work or at work. And he had come home and he came into my room. And he was standing in the doorway and asked me what I was doing and I told him I was playing a game. And then he ended up laying in the bed next to me and then he proceeded to tickle me in-between my thighs and then he proceeded to put his hands in my pants….I don't remember in good detail, but he went between my bed and the wall and then laid behind me and spooned me before he started tickling me…[H]e started playing with my clit. And so- - I don't know how long it lasted, but it was at least five, ten minutes. And then I told him…that I had to go to the restroom so I got up. And the bathroom was right outside my bedroom. So I sat in there for a couple of minutes and then I decided to go in my mom's room and tell her what happened.

Sharpe didn't speak during the encounter.

{¶18} L.R. testified she told her mother and her mother went into the kitchen and talked to Sharpe. Then her mother brought L.R. into the kitchen. L.R.'s mother didn't say anything but Sharpe started crying, got on his knees, held L.R.'s shoulders and said he "would never do anything like that to me, and he doesn't know why I thought he did…that he would never do anything to hurt me." L.R. recalled that Sharpe ended up leaving that night and was gone for a few days. Her mother never told the police and when Sharpe came back into the home "they acted like nothing happened." The incident happened in 2018.

{¶19} In June 2022, the sheriff's office and Children Protective Services (CPS) were notified and they contacted her. L.R. testified she did not know B.B., but she did know A.G. because A.G.'s parents and Sharpe were friends. L.R. had visited A.G.'s house in the past. L.R.'s relationship with her mother is damaged and L.R. now resides with her grandparents.

{¶20} Counts four, five, and six named A.G. as the victim of criminal acts occurring in 2014 and 2015. At the time of trial, A.G. was approximately 25 years old. She met Sharpe when she was 14 or 15 years old because her parents were friends with Sharpe. A.G. saw Sharpe at family cookouts and get-togethers. A.G. testified she sometimes babysat Sharpe's step-daughter.

{¶21} A.G. testified that she "had issues" with her parents and, as a solution, she would go to Sharpe's house "like a sense of like respite care. That's kind of

what we all came up with as the plan." A.G. went to Sharpe's house about once a week and sometimes stayed the entire weekend. A.G. testified that they would "hang out" and she felt like Sharpe was taking on a "parenting role." A.G. helped Sharpe with building a derby car in the garage.

{¶22} A.G. testified the relationship changed when she was 14 and "[h]e started making comments I didn't fully understand." Sharpe said things to A.G. like "I wish you were older or, wow you look good in that." A.G. testified that the comments were not in response to anything, but "very abrupt. It didn't make sense. That's why I asked for clarification." Sharpe didn't really clarify anything until A.G. was closer to turning 16. Just before she turned 16, Sharpe's comments progressed to touching, "a hand on the thigh or like brushing up against me…my breast and my butt." A.G. testified:

> Sometimes it was in his truck, like on the way back from my grandparents' property to my parents' house because he would drop me off, or in the truck from my parents' house over to his house. Or sometimes it would be in the garage, and sometimes whenever we would visit at like his - - at Kevin's gas station. He would like hug me …while my parents were somewhere else and he was visiting, and he would like make it seem like it was an accident that he touched my butt and stuff.

{¶23} A.G. testified that neither Sharpe's wife nor anyone else was present when Sharpe initiated sexual comments and touching. A.G. could not recall exactly when Sharpe's actions went beyond comments and "grazing," but she testified as follows:

I would stay at his house a lot. And my parents had given him my medications because I was diagnosed with a mental health disorder at the time. And the medications that I took would cause me to go to sleep at night. And I remember during that time at some point that I would wake up and a hand would be down my pants while I was asleep…And then a week before my 16th birthday it was no longer just comments or anything. He picked me up (in his truck) and took me back to his house…Originally I was sitting on the passenger side, but he had me move to the middle…He put his arm around me and he went to kiss me and I tried to turn away from it, but he is - - was a lot stronger than me and he held me there…He held me there. And then after he kissed me, he put his hand down my pants - - I think I was wearing shorts at the time because it was summer. And then he proceeded to finger me…At some point we get back to his house. And then whenever we get back to his house, he asked me to come over to the other side of the truck and he hugged me. And I thought all he was going to do was hug me, but then he tried to kiss me again. And then he turned me around and sat me in the truck and pulled down my pants. And I believe I said no at some point. And then he proceeded to try and insert his fingers into my vagina. And then after that he stopped with that and tried to put - - or put his penis inside of my vagina. And went on for like a minute or two and then it was done.

{¶24} During the above incident, A.G. remembered it being dark outside. When Sharpe inserted his fingers inside her, she told him "no," but he did not stop. A.G. testified that after Sharpe ejaculated, he pulled her pants back up and went inside his house. A.G. then went into the house and spent the night. She didn't tell anyone that night what happened because she "just wasn't sure what to do."

{¶25} Later, A.G. attempted to tell her parents but they responded by telling her that she was "lying and seeking attention." A.G.'s parents continued to send her to Sharpe's home for about a year. A.G. also helped Sharpe work on his derby

car in the garage. Sharpe continued to make similar comments as before and that he "wished she was older." One time when they were working in the garage, he "put his hand down my pants and then proceeded to insert a finger into my vagina." A.G. later told her boyfriend.

{¶26} A.G. eventually ran away from her parents' home because she didn't want to go to Sharpe's house. She attempted to tell the officer who arrested her and he also told her she was "lying and seeking attention." A.G. also told a representative of CPS, Katie Hanna, who was interviewing her at school in the guidance counselor's office. A.G. told Hanna that she did not feel safe at home because Sharpe had assaulted her multiple times. A.G. was advised that she needed to "stop telling people that and that was a lie because of that fact that I had a mental health disorder documented at the time, and that [Hanna] believes that my mental health disorder is what was causing me to tell these lies."

{¶27} During A.G.'s testimony, the prosecutor introduced State's Exhibit 1, which A.G. identified as a Facebook post that she made on June 24, 2022. A.G. read the post to the jury:

> Since we no longer - - we are no longer allowed to have an abortion past six weeks in the State of Ohio, even if it is a rape, I think we need to go ahead and inform others to be cautious around - - Picture's below - - the picture below is the man who raped and molested me as a 15-and 16-year-old girl. This man was friends with my parents. He's friends with a lot of people in the community. He used my parents' trust and took advantage of the fact that my mother told everyone I was crazy. I was 15 and

16 years old. If this took place now I would be forced to bear my rapist's child.

A.G. contacted the Hocking County Sheriff's Office to report the assault. She spoke to Detective Scalmato.

{¶28} Counts seven and eight named B.B. as the victim of Sharpe's alleged crimes occurring in 2008 and 2009.[2] At the time of trial, B.B. was 26 years old. She met Sharpe when she was 12 years old, moved to Logan, and met a new friend named Cecily. B.B. believed that Cecily's older sister was married to Sharpe. B.B. and Cecily visited each other's houses.

{¶29} When B.B. was first at Cecily's house, Sharpe was very friendly, almost like an older brother. However, talking later became uncomfortable. Sharpe was "very flirtatious." Sharpe then began touching her inner thighs, butt, arms, and legs on top of her clothing.

{¶30} The first time Sharpe's behavior went beyond touching was in a bedroom at Cecily's house. B.B. was 13 years old. B.B. described as follows:

> It was in a bedroom. We were laying. It was dark. The lights were off. We were watching a movie…[t]here was me, Mickey and Tyler, Cecily's cousin, were in that bedroom at that time watching a movie and that's when he started touching me again. And that's when it started going under clothing…And then it led to…later that night going downstairs into the kitchen and then it was just me and Mickey…Tyler was on the floor. Mickey was on the bed and I was on the bed in the front. He was on the bed

---

[2] B.B. was also named in Count 9, which was tried to the bench.

> in the back against the wall…His hands went into my pants…On
> my leg and then onto my vagina…On the outside.

B.B. testified that Sharpe was moving his hands, "using his fingers." B.B. did not recall if they went inside her vagina. B.B. admitted that she didn't say anything to Tyler and didn't tell Sharpe to stop. Sharpe didn't say anything during the encounter.

{¶31} The sexual activity continued downstairs into the kitchen. B.B. testified that in the kitchen, "[Sharpe] pushed me against the stove and then took my pants down, brought my left leg up and inserted his penis into me." B.B. acknowledged that she did not push him away or tell him "no." Again, Sharpe did not speak. When B.B. was asked why she didn't tell him to stop or yell for help, she testified, "I didn't know what to do…I was 13."

{¶32} The prosecutor asked B.B. if "that ever occurred" again, and B.B. answered "it was more times than I could count." B.B. further testified that she continued to have sex with Sharpe until after she was 18. "I moved when I was 16, so it slowed down but I would go and meet him places…Graveyards, his work at the time." B.B. testified that Sharpe worked at a Marathon gas station known as Kevin's Marathon. B.B. testified they had sex "over in the extra garage where all the tires and coolers were." Sharpe texted her so she knew where to meet. At the time, B.B., believing Sharpe to be married, thought she was in a secret relationship.

{¶33} B.B. testified that the reason she disclosed to law enforcement was that she had seen a story on Facebook by A.G. "asking if this ever happened to them and to come forward." B.B. didn't know A.G. at the time. After the Facebook post, B.B. contacted A.G. and law enforcement.

{¶34} Sharpe's attorney vigorously cross-examined each witness. The defense also presented testimony from witnesses which contradicted or called into question the testimony of the victim witnesses.

{¶35} After our review of the entire trial transcript, particularly the testimonies of L.R., A.G., and B.B., we conclude that the evidence presented at trial is not complicated or confusing, and that the state presented the evidence in a logical manner. The evidence is, in fact, simple and direct. *See Sims*, at ¶ 43; (Citations omitted). *See also State v. Meeks,* 2015-Ohio-1527, ¶ 99 (5th Dist.) (evidence simple and direct when state "clearly laid out [the offenses] for the jury" and "[e]ach victim testified separately"); *State v. Moshos, supra,* at ¶ 82 (evidence simple and direct when each victim "provided a detailed description of her own unwanted sexual encounters with appellant"); *State v. Kissberth,* 2005-Ohio-3059, ¶ 62 (2nd Dist.) (evidence simple and direct when witnesses "testified only to their own experiences with" the defendant); *State v. Ahmed*, 2005-Ohio-2999, ¶ 26 (8th Dist.) (evidence simple and direct when "[e]ach victim testified as to the specific facts giving rise to her separate charges against" the defendant).

{¶36} Finally, courts have determined that any prejudice that may result from the joinder of offenses is minimized when a trial court cautions a jury before deliberations to consider each count, and the evidence applicable to each count, separately, and to state its findings as to each count uninfluenced by its verdict on any other counts.  *See Sims*, at ¶ 48; *State v. Freeland, supra*, at ¶ 16.  Here, the trial transcript reflects that the trial court instructed the jury to consider each count, and the evidence applicable to each count, separately.  Specifically, the trial court instructed:

> The allegations of three individuals have been combined into one trial.  However, you are to consider each of the allegations individually and unaffected by the fact that there are other individuals making allegations against the defendant.  The State must prove each of the allegations beyond a reasonable doubt unaffected by whether there is more than one individual making allegations against the defendant. The charges set forth in each count in the indictment  constitute a separate and distinct matter. You must consider  each count and the evidence applicable to each count separately, and you must state your findings as to each count uninfluenced by your verdict as to any other count.  The defendant may be  found guilty or not guilty of any one or all of the offenses  charged.

 "[A] jury is presumed to have followed the trial court's instructions," and there is nothing in the record to indicate the jury failed to do so in this case.  *See Moshos, supra,* at ¶ 88 (citations omitted), *State v. Williams*, 73 Ohio St.3d at 159, (1995).

{¶37} Similarly, we find nothing in the record to suggest that the jury could not separate the evidence with respect to each offense, or that the jury could have

been confused. For example, in this case, the jury sifted through all the evidence and found Sharpe not guilty of count eight, a rape allegation involving B.B. *See Sims* at ¶ 44; *State v. Evans,* 2012-Ohio-1562, ¶ 38 (4th Dist.) ("Because the jury acquitted [the defendant] of one of the charges, we cannot find that the jury was confused by the evidence, overwhelmed by the number of counts, or influenced by the cumulative effect of the joinder."). In our view, the circumstances suggest that the jury carefully evaluated the testimony of the witnesses and separately deliberated each allegation.

{¶38} Based on the foregoing, we do not believe that the trial court committed plain error by overruling Sharpe's motion to separate the trials. Here, a review of the record reveals that the evidence is simple and direct, and the jury could and did segregate the evidence when it determined whether the State had established, beyond a reasonable doubt, that Sharpe committed the charged offenses. As observed earlier in this opinion, if the State can meet the joinder "simple and direct evidence" test, it need not meet the stricter "other acts" test. *Moshos, supra,* at ¶ 80, citing *State v. Johnson,* 88 Ohio St. 3d 95, 109 (2000). Accordingly, we find no merit to Sharpe's first assignment of error and it is hereby overruled.

{¶39} Sharpe's second assignment of error challenges the trial court's decision granting the State's motion to amend count six. Days prior to trial, when

Sharpe was still facing a 14-count indictment, the State moved to amend the indictment as to count five and renumber the offenses as several were being dismissed.  Sharpe did not object and the trial court granted the amendment.  In doing so, renumbered count six thereafter charged Gross Sexual Imposition (GSI) as a felony of the third degree, R.C. 2907.05(A)(4), which read as follows:

> William Mickey Sharpe, on or about the 1st day of January, 2014 through the thirty-first day of December, 2015, in the County of Hocking aforesaid did have sexual contact with _____, not his spouse, when _____ *was less than thirteen years of age*, whether or not the offender knew the age of that person in violation of Ohio Revised Code 2907.05(A)(4)/2907.05(C)(2), a felony of the third degree. (Emphases added.)

{¶40} Thereafter, on the morning of trial, the prosecutor brought it to the court's attention she had filed a motion to amend count six. The prosecutor represented that when the testimony regarding the count was presented to the grand jury, it was presented as "gross sexual imposition, a felony of the fourth degree." However, the language in current count six contained the "less than thirteen" language, making it a felony of the third degree.  The prosecutor explained that she was moving to amend the count from GSI, R.C. 2907.05(A)(4) to R.C. 2907.05(A)(1), which removed the "less than thirteen" language and changed the conduct to GSI by "force," a felony of the fourth degree.  The prosecutor argued that amendment would not change the nature of the offense, only the level of felony, which was a benefit to the defendant.   Furthermore, the prosecutor argued

it was no surprise to the defense as the victim's date of birth had been known the entire time.

{¶41} Sharpe's counsel objected to the amendment, arguing that the amendment would indeed change the nature of the offense because the grand jury did not hear and decide evidence of "force or threat of force." The trial court granted the amendment, stating that it would allow the amendment because all parties were aware of the victim's age during the proceedings, the amendment would be to a lesser offense in the same category as gross sexual imposition, and Sharpe was not prejudiced by the amendment.

<u>STANDARD OF REVIEW - AMENDMENT OF COUNT</u>

{¶42} A trial court commits reversible error when it permits an amendment that changes the name or identity of the offense charged, regardless of whether the defendant suffered prejudice. *State v. Wilson*, 2019-Ohio-2754, ¶13 (4th Dist.); *State v. Smith*, 2004-Ohio-4786, at ¶ 10 (10th Dist.). "Whether an amendment changes the name or identity of the crime charged is a matter of law." *State v. Cooper,* 1998 WL 340700, *1 (4th Dist. 1998), citing *State v. Jackson,* 78 Ohio App.3d 479, 605 N.E.2d 426 (2nd Dist. 1992). Such a question necessitates a de novo standard of review. *State v. Kittle,* 2005-Ohio-3198, at ¶ 12 (4th Dist.).

{¶43} However, if the amendment does not change the name or identity of the crime charged, then we apply an abuse of discretion standard to review the trial

court's decision to allow a Crim.R. 7(D) amendment. *Id.* at ¶ 13, citing *Smith* at ¶ 10; *State v. Craft,* 2009-Ohio-675, ¶ 27 (12th Dist.). As noted above, an abuse of discretion implies a decision that is unreasonable, arbitrary or unconscionable. *See, e.g., Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219 (1983).

### LEGAL ANALYSIS

{¶44} " 'The purposes of an indictment are to give an accused adequate notice of the charge, and enable an accused to protect himself or herself from any future prosecutions for the same incident.' " *State v. Pepka*, 2010-Ohio-1045, ¶ 20, quoting *State v. Buehner,* 2006-Ohio-4707, ¶ 7. Crim.R. 7(D) provides that a court may amend an indictment "at any time before, during, or after a trial * * *, provided no change is made in the name or identity of the crime charged." *State v. Whitehead,* 2022-Ohio-479, ¶73 (4th Dist.). A case in which the crime remains the same, even after amendment, does not violate Crim.R. 7(D). *State v. Craft,* 2009-Ohio-675, at ¶ 23 (12th Dist.), citing *State v. Davis,* 2008-Ohio-4537, at ¶ 5, (Crim.R. 7(D) does not permit amendment of an indictment where amendment significantly increased the quantity of drugs alleged to have been sold and altered potential penalties as well). In Sharpe's case, it is obvious that the name of the offense remained the same, GSI. The issue presented is whether the identity of the offense changed.

{¶45} To determine whether the "identity" of a crime has changed, the court must examine whether the "penalty or degree" changed. *Craft, supra,* at ¶ 24, citing *Davis,* supra, at syllabus. In this case, the degree of felony changed so technically, as a matter of law, the identity of the crime has changed. However, the change as to the degree of GSI is from a third to a fourth degree felony, which, as the State emphasizes, constitutes a benefit to Sharpe.

{¶46} Sharpe points out that "force or threat of force" is an essential element. It is well-established that the element of force or threat of force must be proven beyond a reasonable doubt. *State v. Ward*, 1995 WL 328164, at *6; *See, e.g., State v. Powell,* 49 Ohio St.3d 255 (1990); *State v. Dobies,* 1992 WL 387356, (11th Dist.). In *Dobies*, the appellate court found that the omission of the element of force from the indictment prevented appellant from being informed of an essential element of the charge against him.[3] Yet, "[a]s long as the state complies with Crim.R. 7(D), it may cure a defective indictment by amendment, even if the original indictment omits an essential element of the offense with which the defendant is charged." *Pepka*, *supra,* at ¶ 15 (On State's appeal asserting that an indictment charging a defendant with endangering children in violation of R.C. 2912.22(A) is sufficient regardless of whether indictment indicates that victim

---

[3] *Dobies,* however, is not on point. There the 2nd Dist. Appellate court found error for the trial court to permit a special interrogatory on the element of force to go to the jury when force was not alleged in the indictment.

suffered serious physical harm, Supreme Court found that original indictment was sufficient to charge appellee with third-degree felony endangering; in addition, Pepka's counsel conceded at oral argument that "We all know that the actual facts necessary to indict for the third-degree felony were present and probably were at the grand jury"). *Id.* at ¶ 23.

{¶47} Our research has led us to the Supreme Court of Ohio's decision in *State v. Rohrbaugh*, 2010-Ohio-3286. There, the Supreme Court of Ohio distinguished its decision in *Davis*, *supra,* noting:

> We found plain error when a trial court amended an indictment to allow a defendant to be prosecuted for a higher degree of a crime. In that case, there was a miscarriage of justice because the prosecution was attempting to "increase the penalty or degree of the offense" charged. Unlike the defendant in *Davis, Rohrbaugh* was not prejudiced by the amendment to the indictment; to the contrary, he gained a benefit.

*Id*. at ¶ 9. *Rohrbaugh* is also not on point. The facts of that case demonstrated Rohrbaugh pled guilty and thus was not prejudiced by the amendment that he had bargained for.

{¶48} Based on our review, it appears to us that the grand jury indeed heard evidence pertaining to force or threat of force prior to returning the original indictment against Sharpe. Our review of the record demonstrates that the allegations pertaining to A.G. in the original indictment were counts nine, ten, and eleven. When the trial court allowed the first requested amendment, which also

dismissed original counts four, five, six, seven, and eight, the remaining counts naming A.G. were renumbered as counts four, five, and six.  Count four became rape by force or threat of force, R.C. 2907.02(A)(2), and count five became attempted rape, by force or threat of force, R.C. 2923.02/2907.02(A)(2).  In *State v. Torres*, 2023-Ohio-1406 (4th Dist.), this court noted that both R.C. 2907.02(A)(2) Rape and R.C. 2907.05(A)(1) GSI require the state to prove that a victim submitted "by force or threat of force."  *Id*. at ¶ 47.  GSI is a lesser included offense of rape. *See State v. Smith*, 2022-Ohio-269.  Given that count six GSI pertains to the same alleged victim, A.G, and also pertains to the same time period, January 1, 2015 through December 31, 2016, it appears that the grand jury  heard evidence pertaining to force or threat of force and chose to indict accordingly.

{¶49} In this matter, we cannot find that the trial court abused its discretion and/or committed reversible error in allowing the amendment of count six.  Sharpe was fully aware of the charge and was able to defend himself.  The jury would have heard evidence of force.  Sharpe was at all times aware of A.G.'s age. Furthermore, as in *Rohrbaugh,* Sharpe is not prejudiced by the amendment to count six and actually gained a benefit.

{¶50} Based on the foregoing, we find no merit to Sharpe's second assignment of error.  Accordingly, it is hereby overruled.

## STANDARD OF REVIEW - SUFFICIENCY OF THE EVIDENCE

{¶51} A claim of insufficient evidence is reviewed primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. *See State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The standard of review is whether, after viewing the evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781 (1979); *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). An appellate court does not weigh the evidence but simply determines whether the evidence, if believed, is adequate to support a conviction; sufficiency does not test the rational persuasiveness of the state's case, but merely its legal adequacy. *State v. Novak*, 4th Dist. Gallia No. 16CA4, 2017-Ohio-455, at ¶ 13; *State v. Koon*, 4th Dist. Hocking No. 15CA17, 2016-Ohio-416, ¶ 17. A reviewing court will not overturn a conviction on a sufficiency-of-the-evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh*, 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

LEGAL ANALYSIS

{¶52} Here, Sharpe contends that the State failed to prove the use of force as relates to amended count six of the indictment, GSI.  Sharpe's argument may be summarized as follows:

> A.G. testified about an incident that occurred in Sharpe's truck after he picked her up.  She makes no allegations nor indicates anything that a reasonable jury could determine was force during the ride in the truck.  When asked how she became closer to Sharpe, she answered that he asked and she moved over.  She did not resist and only sat still.

Sharpe concludes that this evidence is not sufficient to support a conviction for GSI as a reasonable person could not have determined that Sharpe used force.  While we do not disagree with Sharpe's characterization of the testimony, we disagree with his conclusion that sufficient evidence of force was not proven.

{¶53} At Sharpe's trial, the court instructed the jury on the legal definitions of acting purposely, sexual contact, and force, as required to support GSI convictions.  R.C. 2907.05(A)(1) requires the victim's submission to sexual contact to be obtained by force or threat of force.  *Davis,* 2024-Ohio-1504, ¶48 (5th Dist.).  "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."  R.C. 2901.01(A)(1).  *Davis, supra.*

{¶54 } After viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found the

essential element of force proven beyond a reasonable doubt.[4]  In this case, because of A.G.'s parents' friendship with Sharpe, A.G. saw Sharpe about once a week and sometimes stayed as his house the entire weekend.  She actually felt like Sharpe took on a "parenting role."  A.G.'s parents allowed Sharpe to have control over A.G.'s medications.  Sometimes, A.G. testified, she would be sleeping and would wake up with Sharpe's "hand down [her] pants."  A.G. admitted during the encounter in the truck, she moved to the middle of the truck because "he had me to."  However, A.G. also testified that she "tried to turn away" from his kiss "but he was a lot stronger than me and he held me there…And then after he kissed me he put his hand down my pants…and then he proceeded to finger me."

{¶55} Although A.G.'s testimony suggests Sharpe did not use a great amount of force, " '[t]he word "any" specified in the definition of "force" recognizes that various crimes upon various victims require different degrees and manners of force.' "  *See State v. Howard*, 2022-Ohio-2347,  ¶15 (4th Dist.), quoting *State v. Umphries*, 4th Dist. Ross No. 11CA3301, 2012-Ohio-4711, ¶ 17.  In *State v. Eskridge,* 38 Ohio St.3d 56, 58-59 (1988), referenced above, the Supreme Court of Ohio found the amount of force required to meet this

---

[4]We are also mindful that the testimony of one witness, if believed by the factfinder, is enough to support a conviction.  *See State v. Davis,* 2024-Ohio-1504, ¶47 (5th Dist.).  The weight to be given the evidence introduced at trial and the credibility of the witnesses are primarily for the trier of fact to determine.  *Id., citing State v. Thomas*, 70 Ohio St.2d 79, syllabus, (1982).

requirement varies depending on the age of the victim and the relationship between the victim and the defendant. *Id*. at ¶ 58. *Davis,* ¶ 49. " Ultimately, [in *Eskridge,*] the Ohio Supreme Court recognized that coercion is inherent in the parent-child relationship and stated that 'force need not be overt and physically brutal but can be subtle and psychological.' " *Davis*, at ¶ 50, quoting *Eskridge*, *supra*.

{¶56} At the time of the encounter, Sharpe was an adult and A.G. was one week away from her 16th birthday. A.G.'s testimony reasonably leads to the inference that Sharpe was a trusted family friend and A.G. viewed Sharpe as having authority over her. When questioned as to why she didn't tell anyone what happened that night in the truck when the sexual contact and later sexual conduct occurred, A.G. responded she "just wasn't sure what to do." Given these circumstances, any rational trier of fact could have found that Sharpe purposely compelled A.G. to submit by force or threat of force.

{¶57} For the foregoing reasons, we conclude that the state presented sufficient evidence of the element of force to support a conviction for GSI. The third assignment of error is also meritless. Accordingly, we overrule the third assignment of error.

{¶58} Having found no merit to any of Appellant's assignments of error, the judgment of the trial court is hereby affirmed.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Hocking County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Wilkin, J., concur in Judgment and Opinion.

For the Court,

_____

Jason P. Smith
Presiding Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**